UNITED STATES BANKRUPTCY COURT  
WESTERN DISTRICT OF NEW YORK

FOR PUBLICATION

--------------------------------------------------------------

In re

NANODYNAMICS, INC.

Case No. 09-13438 K

Debtor

--------------------------------------------------------------

MARK S. WALLACH, Chapter 7 Trustee of NanoDynamics, Inc.

Plaintiff

-vs-

AP No. 11-1002 K

DAVID SMITH and JENNIFER SMITH

Defendants

--------------------------------------------------------------

Robert J. Feldman, Esq.  
Janet G. Burhyte, Esq.  
Gross, Shuman, Brizdle & Gilfillan, P.C.  
465 Main Street, Suite 600  
Buffalo, NY 14203

Attorney for Plaintiff

Maureen T. Bass, Esq.  
Jon Travis Powers, Esq.  
Buchanan Ingersoll & Rooney, P.C.  
50 Fountain Plaza, Suite 1230  
Buffalo, NY 14202-2212

Attorneys for Defendants

# OPINION AND ORDER

## SUMMARY

(1) If a corporation solicited a stock subscription without making pessimistic disclosures that the corporation itself had decided[1] were required by securities regulations, and the subscriber has not fully paid, may the corporation's eventual Chapter 7 Trustee successfully assert the fact that securities law provisions make it very hard for investors to walk away from their purchase obligations under a stock subscription agreement? The Court answers in the negative.[2]

(2) The possibility that the corporation could have changed its position about its duties of disclosure is of no use to the Trustee because the corporation did not, in fact, change its position. It filed a Chapter 7 petition instead. A trustee cannot roll the clock back and change what he or she thinks was a mistaken overreaction to securities law concerns as applied to a Debtor's finances and prospects.[3]

(3) Restating "(2)" above, when an action rests on 11 U.S.C. § 541 rather than any "avoiding power," a Chapter 7 trustee may not simply "undo" a debtor's pre-

---

[1]This use of the word "decided" will be discussed below.

[2]This type of issue has been around for a very long time. For example, see *Galbraith v. McDonald*, 143 N.W. 353 (Minn. 1913). In that case the high court of Minnesota split over a question similar, but not identical, to the matter before the Court.

[3]Somewhat aside from the legal point, the Chapter 7 filing proved that the pessimism actually was warranted.

petition decisions (even if those were unwise or harmful as to other creditors) just because that would enhance the estate.

## Introduction

### a. Generally

A "stock subscription agreement" is a promise to pay to a corporation a stated sum for a specified number of unissued shares.[4] It is obvious that such an agreement can make an important, favorable impression upon others if it involves large purchases by subscribers who have wealth and good reputation. Many possible future stakeholders might be very attentive: potential lenders to the corporation; other possible investors; possible customers and clients of the corporation; and potential suppliers to the corporation. They all might make choices based upon what the existing stock subscription agreements reflect about the future capitalization of the corporation, and so, its possible credit-worthiness. Also, if the corporation will employ people, then its financial prospects are important to present or potential future workers and, if applicable, their unions. If the success of the corporation will require "bricks and mortar" or other substantial physical infrastructure, then local governments or utilities might be interested in every financial detail of the corporation's capitalization when the corporation seeks tax breaks, energy cost subsidies, or grants for this purpose or that. (And so on.)

---

[4] Kummert, Richard O., "Stock Subscription Law for Practitioners," 63 Washington LR 21 (1988).

Because of these things, stock subscription agreements are not ordinary contracts. They are governed by securities statutes and regulations in at least two regards. The prospective subscriber is entitled to disclosures that are qualitatively similar to those that must be made available to a prospective purchaser of that stock on a regulated market. And, at another point, securities statutes and regulations make it hard for a subscriber to walk away from an uncompleted stock subscription. Various markets can be affected (for the reasons stated above) if such agreements were to be treated simply as promissory notes. In fact, even if a corporation has agreed to <u>release</u> a subscriber from his or her obligation under the subscription contract, that agreement can be viewed to be <u>void</u> as a fraud upon creditors, other subscribers, and stockholders of the corporation. "The theory [is] that a subscription to the stock of a corporation, which stock is open for general subscription, is an undertaking not only between each subscriber and the company, but between him or her and all other subscribers to the common enterprise."[5]

Further, "insolvency of the corporation would constitute no defense to an action on a stock subscription. Money paid on a stock subscription belongs to the creditors of the corporation, and cannot be recovered on the ground that the corporation is unprofitable and that its enterprises contemplated have not been carried out."[6]

---

[5] 18 A Am. Jur. 2d, Corporations § 498. [Authorities omitted].

[6] 18 A Am. Jur.2d, Corporations § 535 [Authorities omitted]. (This is not, however, an action by the investors to recover money paid.)

Although "subscribers in many cases have asserted a number of defenses to actions on subscriptions . . . , the tendency of the courts has been to discourage these efforts of subscribers to repudiate their acts."[7] But corporate violations of state "blue sky" laws or federal securities regulations may be asserted as a defense to a corporate seller's action to recover on a subscription contract.[8] For example, in the case of *Menominee Community Building Company v. Rueckert*, 245 Michigan 37, 222 Northwest 162 (1928) a subscriber sustained a defense against an action on the subscription agreement because the person who solicited the investment was not a licensed seller of stock in the state of Michigan: Michigan's blue sky laws were violated, and the stock subscription agreement was unenforceable.

The present case is not quite like that. The Defendants do not <u>necessarily</u> ask this Court to find that the Debtor corporation violated securities regulations so as to render unenforceable their remaining obligation under the subscription agreement. (They would like for the Court to find a violation, because that might help them defend against the Trustee's other theories for recovery.) They argue that certain analyses undertaken by the Debtor (and certain decisions made by the Debtor) regarding the Debtor's obligations under federal securities regulations would have rendered it impossible for the Debtor to sustain its burden of proof if the Debtor had sued the Defendants upon the subscription agreement instead of filing a Chapter 7

---

[7] 18A Am. Jur.2d Corporations § 553 [Authorities omitted].

[8] 18A Am. Jur.2d, Corporations § 554 [authorities omitted].

petition.[9]

### b. This Case.

It is undisputed that the Debtor here was a "start-up company" that was already incorporated by the time it solicited the Defendants to invest. It wanted to become publicly-traded but it never got there. A voluntary petition was filed under Chapter 7 on July 27, 2009. The Chapter 7 Trustee has been diligent in liquidating the assets of this very substantial corporation for five years.[10] In this Adversary Proceeding he seeks to collect $700,000 from the Defendants. They were investors in the Debtor pursuant to a "private placement." They signed what federal regulations[11] define as "a stock subscription agreement" promising to pay $2.5 million for 2.5 million shares in the Debtor. (It seems that the Defendants own and work a substantial acreage of rice fields, and have meaningful wealth.) They did pay $ 1,800,000 for 1,800,000 shares

---

[9]The parties seem to think that the case of *In re International Business Machines Corporation Securities Litigation*, 16 F.3d 102 (2nd Cir. 1998) has relevance here. In that case, the Second Circuit held that an investor who claims a violation of Section 10(b) of the Securities Exchange Act of 1934, and of Rule 10b-5, must show that the debtor (a) made misstatements or omissions of material facts; (b) with scienter; (c) in connection with the purchase or sale of securities; (d) upon which the investor relied; and (e) that the investor's reliance was the proximate cause of his or her injury. The case and its holding have some relevance here, but it is not necessary that the Defendants prove each element of the standard in order to sustain their defense. The five-prong standard must be met when an investor or the Securities and Exchange Commission is a plaintiff in an action against a corporation for money damages. The Defendants do not ask this Court for any affirmative relief against the Debtor corporation. The IBM case and its holdings do have relevance in that the Defendants' submissions demonstrate that the analyses and deliberations undertaken by the Debtor, and the decisions made by the Debtor, all prior to the time that the Defendants were solicited to subscribe, were manifestly guided by the five-prong standard articulated by the Second Circuit.

[10]Some of the assets involved information technology that the Trustee could sell only in a manner consistent with federal contracting statutes and regulations. That has caused delays.

[11]References below to "§ 10(b) and Rule 10-b-5" are references to 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5.

that were issued by the Debtor before bankruptcy.[12] The Trustee alleges that the Defendants (Mr. and Mrs. Smith) are bound to pay the last $700,000 even though the Debtor probably could not have issued the stock certificates while insolvent (as a matter of state law), and even though <u>he</u> (a Chapter 7 Trustee) may not issue the shares. (11 U.S.C. § 365(c)(2))

For purposes of this decision (which deals only with § 10(b) and Rule 10b-5 matters) the dispute is not about whether certain disclosures about the Debtor's financial condition were required by law. Rather it is about whether the Defendants would have had a complete 10(b) and 10b-5 defense if the Debtor had sued them for the $700,000 on the petition date (July 27, 2009) instead of filing to liquidate here under Chapter 7."[13] If so, then the Trustee cannot succeed here on a securities law theory, as explained below.

The forces that might motivate an investor to undertake the risks of such a

---

[12] Initially they paid $500,000. Later they paid $1.3 million. The later payment is argued by the Trustee to have particular importance, as discussed below.

[13] Some disclosures required by regulations were provided or otherwise made available to the Defendants by the Debtor's various agents. However, the critical matter seems to the Court to be what has been labeled as "the Draft Addendum," circulated within the Debtor's governance structure. It told of the prospect of a less-rosy future for the Debtor than what had been disclosed to the Defendants, and it was not shared with them until after (1) they signed for 2.5 million shares, and (2) the Debtor accepted the agreement. The "Draft Addendum" is very important from the Defendants' point of view. It contained what this Decision will refer to as "new information." The Defendants refer to that new information as "critical" and "material" under § 10(b) and Rule 10b-5. (The Trustee disputes every aspect of this. He argues that the Draft Addendum is irrelevant; that it contained nothing "new;" that anything that might have been "new" was neither "material" nor "critical;" and that it would have been ignored by these Defendants, anyway.) It seems that the corporation directed disclosure of the "new information" by its agents to prospective subscribers despite the lack of any corporate resolution or even any view of "finality" (in a corporate sense) of the "Draft Addendum." It is not disputed that the private placement agent who successfully solicited the Defendants did not disclose the "new information."

stock subscription agreement are illustrated in this case. Although the Court has not yet done any factfinding in this case, it does not seem to be disputed that a representative of the Debtor (Mr. Blakely) told the Defendants that a $2.5 million investment from them would suffice to carry the Debtor over to an Initial Public Offering ("IPO").[14] The Trustee argues that the Defendants knew that they were looking at a <u>risky</u> investment that nonetheless had a <u>major possible "up-side</u>." He asserts, for example, that although the Defendants were solicited to invest at $5.00 per share, they negotiated the price down to $1.00 per share, plus other concessions. (The Smiths obtained stock warrants, and Mr. Smith was given a place on the Debtor's Board of Directors.) They showed sophistication (he argues) that belies their claim that they are simple "rice farmers from Arkansas." He observes that if the anticipated IPO had occurred and if it had achieved only just $2.00 per share, then the Smiths would have doubled their $2.5 million investment.

This aspect of this Adversary Proceeding turns upon this - - The Smiths claim under oath that at the time that they signed the subscription agreement they did not know that the Debtor was <u>"suffering a liquidity crisis"</u> that had caused it to consider options that included the <u>"possibility of a Chapter 11 filing,"</u> nor did they know (they attest) that <u>one or more of the Debtor's corporate principals had had at least one meeting with one or more of Buffalo's prominent Chapter 11 attorneys regarding such a</u>

---

[14]The fact that Blakely made that or a similar statement is not in dispute. Whether it violated securities regulations is disputed, but that dispute is not relevant to this Decision.

possible Chapter 11 filing.[15] The Smiths have apparently repeatedly testified under oath that if they had been told these things, they would <u>not</u> have invested.

To that the Trustee essentially says "So what?" To paraphrase his arguments, - - "They knew from the limited disclosures that they had been given (<u>if they even read them</u>) that this was a risky investment, and they paid no attention to the risks. Ignore, Judge, what they say under oath now. The 'new information' added nothing to what they knew. And they would have ignored the 'new information' anyway, as demonstrated by at least two facts: (1) Mr. Smith did not seek to rescind the subscriber agreement when he learned of the 'new information' after he received preparation materials for his first appearance on the Board of Directors, and (2) they made the second purchase required by the Agreement - - $1.3 million for 1.3 million shares - - <u>after</u> they received the 'new information.' They waived any §10(b) and 10b-5 defenses."

## The Procedural Posture

There are very many causes of action in this Adversary Proceeding and very many affirmative defenses. The complexity of the motion practice in this

---

[15]Besides the points about liquidity and Chapter 11, the "use of proceeds" disclosure in the <u>earlier</u> solicitation stated that proceeds would be used for the "purchase of capital equipment and expansion of our product or facility, including expenditures necessary for commercial production, and for working capital and other general corporate purposes." In the <u>Draft Addendum</u> it would have read "the proceeds of this offering alone will be insufficient for the purchases of capital equipment and expansion of our production facility to support the production of commercial products."

Adversary Proceeding is highly unusual in this Court.[16] Because all counsel in this Adversary Proceeding are well-known to the Court and are held in high regard, they were given free rein by this writer to file everything they thought necessary, and then to seek a ruling from the Court. They realize what the Court faces now, and so they have been considerate of the Court and have been civil to the Court and to each other in presenting the many combinations and permutations that emerge from their respective arguments and theories.

This Decision will address only the § 10(b), Rule 10b-5 issue that was raised in the cross-motions for summary judgment.

### The Arguments

This part of the broader Adversary Proceeding is a 11 U.S.C. § 541 or § 542 cause of action. The Trustee has agreed on the record (as to the § 10(b), Rule 10b-5 theory) that *if* the Defendants would have had a complete defense as against the

---

[16]The following is an itemization of many of the relevant submissions, all supported by extensive briefs and memoranda, and some degree of oral argument.

1. Defendant's Motion to Dismiss Adversary Complaint
2. Plaintiff's Objection to Defendants' Motion to Dismiss
3. Defendants' Amended Motion to Dismiss
4. Defendants' Answer to Complaint and Counterclaim
5. Defendants' Motion to Amend Answer
6. Plaintiff's Response to Motion to Amend Answer
7. Plaintiff's Motion for Summary Judgment or to Strike Affirmative Defenses and Counterclaims
8. Defendants' Motion for Summary Judgment
9. Plaintiff's Reply to Counterclaims of Amended Answer
10. Plaintiff's Response to Defendants' Motion for Summary Judgment
11. Defendants' Opposition to Plaintiff's Motion for Summary Judgment
12. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment

Debtor (if the <u>Debtor</u> had sued them on the stock subscription agreement at a moment before the Petition was filed), then they have a complete defense against him here now.[17] We must, then, think of this as an action commenced by Nanodynamics against the Smiths back on the day that Nanodynamics became the Debtor - - July 27, 2009.

The Defendants argue that before they signed the subscription agreement the Debtor <u>had decided, as a matter of corporate governance</u>,[18] that §10(b) and Rule 10b-5 required that potential investors such as the Smiths must be informed by the Debtor and its agents, brokers, etc., of certain "material" and "critical" new, negative information, *to wit* the liquidity crisis, the change in the intended "use of proceeds," and the possible Chapter 11 filing. It is not disputed that the new information in the Draft Addendum was not disclosed to them <u>until after the Debtor accepted their subscription.</u> The Defendants also have attested that they had no knowledge of the "new information" when they were solicited, and that they would not have subscribed had they known it.

---

[17]The Defendants agree with that formulation for purposes of the narrow issue addressed here. But they dispute it as to the Trustee's other theories of recovery. As to those they point out that the Debtor scheduled the subscription agreement as an "executory contract" and that the Trustee may not sue upon it because he cannot assume it, because 11 U.S.C. § 365(c)(2) prohibits him from issuing securities. The Court is not addressing that issue in this particular Decision in which the Defendants "win" as to another aspect of their defense.

[18]The parties' Briefs are inconsistent about whether the Draft Addendum was ever "finalized," but there is no dispute that a "Shareholder Update" containing the new information was e-mailed to a prospective investor (discussed below) just a few days after the Debtor accepted the Smiths' subscription agreement. It also seems to be undisputed that the agents of the corporation had been told, <u>before</u> the Smiths signed-on, to disclose the new information to prospective subscribers. The Smiths attest that the agent who solicited them made no such disclosure, and there is no proffer to the contrary from the Trustee. In sum, whatever the "finalization" of a "draft addendum" means or might require under securities regulations or corporate-law jurisprudence, is of no moment here. The Debtor was sufficiently far along a downgrading of its prospects that this Court finds that it "decided" that the new information had to be disclosed. To be clear, this Court does not find as a matter of law that the "new information" had to be disclosed. It finds only that the Debtor could not have prevailed if it had sued the Defendants, rather than filing a Chapter 7 petition, on July 27, 2009.

Thus, they insist that the Debtor could not have employed § 10(b) and Rule 10b-5 to enforce the stock subscription agreement. (Actually they seek a broader holding. They argue that this action against them fails under any theory. This will be addressed below.)

They also argue that it makes no difference whether the Trustee (or even the Court) agrees or disagrees with the Debtor's determination that the "new information" was so "critical" and "material" that it had to be provided to persons situated like the Defendants, before such persons subscribed. They argue that although the Board of Directors might not have yet resolved that § 10(b) and Rule 10b-5 required disclosure of the "new information" in the Draft Addendum before another investor would be solicited, the Debtor was counseled (and its agents actually had been instructed) to disclose the "new information." Because the Debtor could not successfully have sued the Defendants to collect the $700,000 (they insist), the Trustee may not succeed.

The Trustee does not agree that that is the law. He argues that circumstances could have changed, and the Debtor could have changed its mind about its growth prospects, and about what disclosures were required by law. It could have decided to make the disclosures after the Defendants signed the subscription agreement and see if the Defendants wished to go forward upon the agreement (rather than to rescind it). Because the Defendants went ahead for an additional $1.3 million as noted above, he argues that that purchase was a decisive waiver of § 10-b and Rule

10b-5 rights. (He also makes other arguments that are not within the scope of this particular Decision.)

## Discussion

Although it is true that the Debtor could have changed its mind about what § 10(b) and Rule 10b-5 required, it did not do so, and that is dispositive of this part of the Adversary Proceeding. The Debtor here could not have carried its burden of proof in an action against these Defendants before it filed its Chapter 7 petition, because (1) in such a suit it would have had to concede that it did not make disclosures that it, itself, insisted to its agents were required to be made as a matter of law and (2) it had no evidence to dispute the Defendants' oaths that they would have declined to subscribe if they had received that information.

The typical § 10(b), Rule 10b-5 case is an action by an investor or by the S.E.C. For example, in *IBM* (discussed above) the corporation denied the need for a relevant downward projection in its financial disclosures. The plaintiffs in that case argued that IBM hid a "critical" and "material" change. The Circuit agreed with IBM that nothing was hidden. The <u>investors</u> did not sustain <u>their</u> burden. They were the <u>plaintiffs</u>. Here "they" (investors) are <u>defendants</u> - - the Smiths.

And because § 10(b) and Rule 10b-5 cases almost <u>always</u> present investors (or the S.E.C.) as **plaintiffs**, almost every case on the subject deals with the investors' (or S.E.C.'s) burden to prove that § 10(b) or Rule 10b-5 was violated by the

corporation. (That is the five-prong standard from the IBM case quoted above.) Few federal cases are found in which an **investor** would be a **defendant** in a case under that statute or that rule and in which the **corporation** would be the **plaintiff**. (State law cases are more common; e.g. *Menominee*, cited above.) Rarer still might be cases in which a corporation sues a subscriber under the '33 or '34 Act or Rule 10 b-5 <u>after that corporation</u> decided that its own solicitation disclosures were inadequate (under law) at the time that the subscription was solicited and signed and was accepted by that corporation.

There is other undisputed evidence in the Defendants' favor. It seems to be undisputed that (1) whether (as noted above) "finalization" of the Draft Addendum containing the new information ever occurred, all agents of the Debtor had already been told to disclose the new information to potential subscribers, and (2) the new information <u>was disclosed</u> to a <u>different subscriber</u> - - Mr. Thomas DelGiorno - - no later than March 19, 2009, which was 10 days after Defendants executed their subscription agreement and fewer days after the Debtor's "acceptance" of the Smiths' agreement, yet the Debtor promptly returned Mr. DelGiorno's $ 25,000 check to him. Nothing of material consequence seems to have happened in between except for the Debtor having accepted the $2.5 million commitment from the Defendants. The Defendants were put on "the hook" for $2.5 million, then Mr. DelGiorno was let off his $25,000 "hook."

Citing the cases of *In re Time Warner, Inc. Securities Litigation*, 9 F.3d at

268 (2d Cir. 1993), and *Anderson v. A. T.& T. Corporation*, 2010 Westlaw 1780953 (S.D.N.Y. May 4, 2010), the Defendants argue that the subscription agreement is the product of illegal conduct that rendered the agreement unenforceable *vel non* when the Debtor "accepted" their signatures on the subscription agreement after the Debtor had concluded that it had a duty to disclose the new information to prospective subscribers. The Debtor had become a "seller" which took "advantage of information known to it but not to . . . the investing public . . . in connection with the sale of [the] securities."

For the Court to find "illegal conduct" under § 10(b) and Rule 10b-5 might be expensive to prove, by its nature.[19] The Court does not go so far today.

### Burden of Proof, and Sufficiency of the Evidence

To reinforce the preceding recitation, the Court adds this. The Defendants point out that the Trustee has no evidence to refute their sworn testimony that they would not have signed the subscription agreement if they had known the "new information" before they signed. Thus (and also because they believe that they have established the other four prongs of the five-prong test under § 10(b) and Rule 10b-5) they believe that they are entitled to dismissal of all of this Adversary Proceeding as a matter of law.

The Trustee, however, believes that the conduct of the Defendants (or at

---

[19] When the S.E.C. or a group of investors undertakes that effort; it is probably an expensive endeavor. This Court will not force the parties to fight such a war, but will hear and decide it if it must. See the end of this Decision.

least the conduct of Mr. Smith) belies his attestations (perhaps Mrs. Smith's attestations too). The Trustee believes that at a trial the finder of fact could conclude that the Smiths signed the subscription agreement solely (or at least primarily) because they relied upon the statement of Mr. Blakely to the effect that their $2.5 million investment would carry the Debtor through to an IPO, and either (1) did not rely upon any information that was contained in the earlier disclosures by the Debtor or (2) ignored that information. He argues that Blakely's was a permissible "opinion that did not violate § 10(b) or Rule 10b-5." The Trustee adds that Mr. Smith's conduct after he learned of the more serious finances of the Debtor also belied his and his wife's attestations. They did not seek to rescind the subscription agreement. They did not take other steps in reliance upon their rights under § 10(b) or Rule 10b-5. They continued to make the second major purchase pursuant to the subscription agreement ($1.3 million), and Mr. Smith continued to sit on the Debtor's Board of Directors.

Going to matters of proof, the Trustee places great reliance on *Frota vs. Prudential*, 1987 WL 4925 (S.D.N.Y. 1987). That court stated as follows.

> **[The] Securities and Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."** (Citations omitted)

See also *Black v. Riker-Maxson Corporation*, 401 F.Supp. 693, 699 (S.D.N.Y. 1975) and *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 213-14 (9th Cir.

1962).

However, *Frota* was a case in which the <u>plaintiffs</u> were <u>investors who wanted their $2,000,000 back</u>. *In re Black* and *In re Royal Air*, are also cases in which the corporation was the defendant, not the plaintiff, and plaintiffs sought monetary recovery.

Here the <u>corporation</u> sues <u>through</u> the Trustee, and the Smiths raise the securities laws as a <u>defense</u>, not a demand for a return of money. They argue the securities laws as the proverbial "shield, rather than a sword."

As we carry that distinction forward, we note that counsel for the Defendants emphasized at oral argument that the Trustee as Plaintiff has no <u>direct</u> proof that the Defendants are lying when they attest that they would not have subscribed had they been told of the possible bankruptcy. She noted that the Smiths have not been shown to make inconsistent statements; they have not signed any <u>enforceable</u> waivers or acknowledgments or merger clauses regarding full disclosures; and there are no witnesses to contradict their testimony as to their state of mind, etc.

The Trustee does not dispute those representations (except as to merger clauses). Rather, it seems that the Trustee argues that he would (if permitted to proceed to trial) build his case-in-chief upon inferences, and, possibly, from cross examination of the Defendants and witnesses. As to the limited question before the Court at this time, it is important that the procedural posture be remembered. These are cross-motions for summary judgment. For the Defendants to prevail on their Motion

they must overcome the presumption that disputed issues of fact will be viewed in the Trustee's favor. That said, the non-moving party must present enough evidence to demonstrate a "genuine" dispute of material fact, (*Celotex,* 477 US. 317 (1986)), not the <u>mere prospect that a triable issue of fact could possibly emerge from the testimony at trial</u>. The Trustee's Rule 56 response fails under that test.

## Conclusion

Excellent pre-trial discovery, motion practice and briefings bring this aspect of this case before the Court in a well-focused *Celotex* context.[20] The Court rules that the Trustee may not get to trial by arguing that the "genuine" dispute will become evident by the time that the evidence is "in" and the matter goes to the finder of fact. The Trustee's notion that he will <u>create</u> a dispute at trial by skillful cross-examination does not survive *Celotex*.

The Court finds that the stock subscription agreement would not have been enforceable by the Debtor against the Smiths under Section 10(b) or Rule 10b-5 on the date of the filing of the bankruptcy petition. Therefore the Trustee, upon that theory, is foreclosed.

That leaves the question of whether the agreement is enforceable as a

---

[20] In most regards, this is not like the case of *Powell v. Manko*, 2014 WL 117301 (Bankr. W.D.N.Y. 2014), but the result is the same. A plaintiff cannot get past a dispositive pretrial motion by a defendant if the plaintiff has shown nothing that suggests an ability to carry the ultimate burden of proof other than by means of promising brilliant cross-examination that will cause adverse parties or witnesses to wither on the stand and change their pre-trial oaths.

simple contract or some other theory, as the Trustee has argued.

The Smiths have raised many defenses such as fraud in the inducement, promissory fraud, prior breach by the Debtor that excuses performance by the Defendants, Debtor's violation of covenants of good faith and fair dealing, etc. Some of those defenses might have been waived for one reason or another.

The Court directs the parties' counsel to discuss which issue of law should be decided by the Court next (assuming that it is agreed that evidentiary hearings or a trial are not yet required). Counsel shall advise the Court by letters before January 5, 2015, as to what should come next,[21] and this Adversary Proceeding is restored to the Court's calendar for **January 21, 2015 at 11:30 a.m.**.

SO ORDERED.

Dated:	Buffalo, New York
		December 12, 2014

_____
U.S.B.J.



---

[21]The "executory contract" theory argued by the Smiths could end this entire Adversary Proceeding if sustained. But if not sustained, then a future progression of arguments is not self-evident.

| | |
|---|---|
| In Re:<br><br>  NanoDynamics, Inc.<br><br>                Debtor(s) | Case No.: 1−09−13438−MJK<br>Chapter: 7 |
|   Mark S. Wallach<br>                Plaintiff(s)<br>   v.<br>  David Smith<br>  Jennifer Smith<br>                Defendant(s) | A.P. No.: 1−11−01002−MJK |

## NOTICE OF ENTRY

**PLEASE TAKE NOTICE** of the entry of the Order referenced below, duly entered in the within action in the Clerk's Office of the United States Bankruptcy Court, Western District of New York on **December 12, 2014**. The Clerk of Court of the United States Bankruptcy Court, Western District of New York, hereby certifies that a copy of the subject Order was sent to all parties in interest herein as required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

Docket #120:   Decision and Order Signed on 12/12/2014 (RE: related document(s)84 Motion for Summary Judgment filed by Counter−Defendant Mark S. Wallach, Plaintiff Mark S. Wallach, 89 Motion for Summary Judgment filed by Counter−Claimant David Smith, Defendant David Smith, Counter−Claimant Jennifer Smith, Defendant Jennifer Smith). NOTICE OF ENTRY. (Bessinger, M.)

Date: December 12, 2014                                Lisa Bertino Beaser
                                                                      Clerk of Court

Form ntcentry/Doc 120
www.nywb.uscourts.gov